UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DR. SAMIR ELIAN,

Plaintiff,

Case No. 25-cv-12797

v.

HON. MARK A. GOLDSMITH

BOARD OF HOSPITAL MANAGERS OF THE CITY OF FLINT, et al.,

Defendants.

_______________________________________/

**ORDER (i) GRANTING IN PART THE BOARD'S MOTION TO DISMISS (Dkt. 19) AND (ii) GRANTING IN PART DR. ALKOTOB'S MOTION TO DISMISS (Dkt. 20)**

This case concerns the alleged retaliation against a cardiologist at Hurley Medical Center (HMC) in Flint Michigan. Plaintiff Dr. Samir Elian worked at the hospital for over 20 years. He brought this action against the board of hospital managers of the City of Flint, which operates HMC; Melany Gavulic, president and CEO of HMC; and Dr. Luay Alkotob, another cardiologist at HMC. In his amended complaint, Dr. Elian alleges: retaliation in violation of 31 U.S.C. § 3730 (Count I), tortious interference (Count II), false light invasion of privacy (Count III), and retaliation under the First Amendment (Count IV). [1] See Am. Compl. Before the Court are Dr. Alkotob and the other Defendants' motions to dismiss the respective counts against them (Dkts. 19, 20). [2]

---

[1] Prior to the filing of the amended complaint, Defendants each submitted motions to dismiss (Dkts. 14, 15). In response, the Court ordered that Dr. Elian "may file an amended complaint within 21 days from the filing of the motions to dismiss." 12/31/25 Order at PageID.166 (Dkt. 17). The Court further ordered that if Dr. Elian "files an amended complaint, the Court will deny without prejudice the currently pending motions to dismiss as moot." Id. Dr. Elian timely filed an amended complaint. Accordingly, the earlier motions to dismiss, Dkts. 14, 15, are denied as moot.

[2] While Dr. Alkotob has retained his own counsel and filed a motion to dismiss, he also joins the Defendants' motion to dismiss. Mot. at PageID.238 (Dkt. 20).

For the reasons below, the Court grants in part Dr. Alkotob's motion to dismiss and dismisses Counts I and III against him. Counts II and IV against Dr. Alkotob will proceed. The Court further grants in part the other Defendants' motion to dismiss. The Court dismisses Counts I, II, III of the amended complaint against the Board and Gavulic. Count IV is dismissed with respect to the Board but will proceed against Gavulic and Dr. Alkotob.[3]

## I. BACKGROUND

The following facts are alleged in the amended complaint. Dr. Elian is a board-certified cardiologist who has worked for and with HMC for over 20 years. Am. Compl. ¶ 9. His duties at HMC included working as the senior cardiologist, providing teaching services for the internal medicine residency program and serving as coordinator of that program, and providing emergency room coverage. Id. ¶ 10. Through his contractual relationships with HMC, Dr. Elian shared teaching blocks by rotation over the years with two other cardiologists, Defendant Dr. Alkotob and Dr. Syed Ahmed (the latter is not a named defendant). Id. ¶ 11.

In addition, during the past 20 years, Dr. Elian has also held various leadership positions at HMC, including two terms as chief of cardiology and co-director of the catheterization laboratory. Id. ¶ 14. While serving as chief of cardiology in 2020 and 2021, Dr. Elian brought significant medical concerns to the HMC administration and medical leadership, including, but not limited to CEO Gavulic. Id. Dr. Elian voiced concerns regarding patient safety, lack of structured cardiology Quality Assurance (QA) process, contractual and administrative

---

[3] Because oral argument will not aid the Court's decisional process, the motions will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). The briefing includes: (i) Dr. Alkotob's motion to dismiss, Plaintiff's response (Dkt. 22), and Dr. Alkotob's reply (Dkt. 24); and (ii) Defendants' motion to dismiss, Plaintiff's response (Dkt. 23), and Defendants' reply (Dkt. 25).

irregularities, and governance issues pertaining to transparency and management involving IGT funds. "All of Dr. Elian's efforts were muted and he was criticized and ostracized." Id. While Dr. Elian was marginalized for voicing his concerns, those silent and loyal to Gavulic were rewarded with directorship appointments and stipends. Id. ¶ 15. One of those rewarded physicians was Dr. Alkotob, the current chief of cardiology and director of the catheterization laboratory at HMC. Id. ¶ 16. Around July 2024, Gavulic appointed Dr. Alkotob as associate program director of internal medicine as well as the specialty education coordinator for cardiology within the internal medicine residency program at HMC. Id.

In recent years, Dr. Elian and several others questioned many administrative, governance and operational issues at HMC that impacted patient safety and patient care. Id. ¶ 17. Dr. Elian and others reported multiple significant violations and suspected violations of the law to Defendants. Id. For instance, Dr. Elian indicated to Gavulic and others that there was a direct correlation between the lack of health care providers in specialized areas, such as cardiothoracic surgery, and unnecessary patient harm and sometimes death; Dr. Elian complained to Gavulic about the lack of transparency related to intergovernmental transfer (IGT) money, which are "transfers of funds from one governmental entity (e.g., a county or other state agency) to a Medicaid agency before a Medicaid payment is made," and the lack of proper distribution of the same, which directly impacted patient safety; Dr. Elian complained to Gavulic, the chief medical officer (Dr. Michael Jaggi), and the chief of staff (Dr. Khaled Ahmed), and others regarding specific cases where patients died unnecessarily because HMC did not have cardiac QA in place; and Dr. Elian objected and raised concerns about the legality of multiple contracts awarded to some cardiologists as well as arrangements with certain primary physicians. Id. ¶¶ 18–21, 177.

Dr. Elian also voiced his cardiology QA concerns to the Mayor of Flint, who "had an active role with the Board." Id. ¶ 48.

In an attempt to silence Dr. Elian, Gavulic and the other Defendants worked to terminate Dr. Elian's contracts, to interfere with his business opportunities, to disparage his professional reputation and ability, and/or to terminate his privileges at HMC. Id. at ¶ 54. When Dr. Elian raised his concerns about the unlawful conduct internally (including to HMC's compliance officer), HMC sought to silence him by harassing him and making false statements about his effectiveness as a leader, an interventionalist, and an educator. Id. ¶ 55. Defendants manufactured pretextual reasons to suspend him from procedures and ultimately terminate Dr. Elian. Id. ¶ 56. Once his status as a possible whistleblower became known to Defendants, HMC sought to force Dr. Elian out of his job. Id. First by seeking to terminate him under the false pretense that there were medical complaints raised anonymously regarding his interventional/catheterization lab skills, and second, by terminating his contracts. Id.

On and around September 17, 2020, Dr. Elian was informed by HMC that it was terminating his cardiovascular service agreement. Id. ¶ 57. Dr. Alkotob and Dr. Ahmed were reassured by HMC that no changes would be made to their contracts which were similar, despite the fact that they too had been given a "termination" notice. Id. Dr. Elian alleges that the termination notices to Dr. Alkotob and Dr. Ahmed were a ruse to make it appear that all of the cardiology contracts were under review. Id. In 2023, Dr. Alkotob, through planning with HMC management, including Gavulic, had secured the staffing resources to take over Dr. Elian's responsibilities at HMC. Id. ¶ 61. In early 2024, Dr. Alkotob became the chief of cardiology. Id. ¶ 63.

In February 2024, "an illegitimate and pretextual QA investigation was instigated and launched against Dr. Elian," which he believed to be initiated by Gavulic and Dr. Alkotob. Id. ¶¶ 64-65. Dr. Elian was warned by two of his colleagues to "stop complaining." Id. ¶ 70. Dr. Elian interpreted the warning to mean that if he continued to challenge any aspect of the investigation or subsequent FPPE, Gavulic would directly report Dr. Elian to the Centers for Medicare & Medicaid Services (CMS). Id. "The threat of referring him to CMS would not only tarnish his reputation among his peers, but it would also cause HMC to either suspend his privileges or not renew them." Id. ¶ 71. The action threatened his career and livelihood. Id.

Other physicians confided in Dr. Elian that Dr. Alkotob had advised them, as early as February 2024, to distance themselves from Dr. Elian and not to consult him on cases. Id. ¶ 73. One physician at HMC told Dr. Elian that he was advised by Dr. Alkotob to "stay far away from" Dr. Elian. Id. This warning was given at least a month prior to Dr. Elian being informed of the "investigation" related to the "anonymous complaints," leading Dr. Elian to believe that the retaliation he was beginning to experience was pre-planned. The anonymous "investigation" forced Dr. Elian to be placed on a Focused Professional Practice Evaluation ("FPPE"). Id. ¶ 74. Rather than suspending Dr. Elian from his other posts, Defendants only chose to remove him from his role as instructor in the internal medicine residency program. Id. ¶ 75. Although Defendant Alkotob initially denied any involvement in reviewing Dr. Elian's cases, HMC's chief medical officer later acknowledged that Defendant Alkotob reviewed all seven cases and selected three for external review, bypassing the usual internal QA process that fell within Defendant Alkotob's own responsibilities as chief of cardiology. Id. ¶ 79.

In addition to the anonymous complaints investigation, when Dr. Elian tried to defend against these false accusations, two separate sham HIPAA investigations were conducted in or

around August and November 2024. Id. ¶ 81. Dr. Elian believes that the HIPAA allegations were baseless and without merit and were intended to intimidate Dr. Elian and pressure him to voluntarily depart from HMC. Id. In or around December 2024, after Dr. Elian had been terminated from all of his contracts with HMC in favor of Dr. Alkotob, Dr. Elian was informed that HMC would be taking no action with regard to the "anonymous" complaints or the alleged HIPAA violations. Id. ¶ 82. Dr. Elian then initiated this lawsuit against Defendants.

## II. ANALYSIS [4]

In their respective motions, Dr. Alkotob and the other Defendants argue that all four counts against them should be dismissed. The Court will discuss both motions together and treat them separately where appropriate.

### A. Motions to Dismiss

#### 1. Retaliation under False Claims Act

In Count I, Dr. Elian alleges that Defendants retaliated against him for engaging in protected conduct under the False Claims Act (FCA), 31 U.S.C. § 3730, by working "in concert to suspend and ultimately terminate [his] contracts with HMC." Am. Compl. ¶102. The FCA protects "[a]ny employee, contractor, or agent" from retaliation "because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action" under the FCA or "other efforts to stop" violation(s) of the FCA. 31 U.S.C. § 3730(h). To establish a prima facie case, a plaintiff must prove that: (i) he engaged in protected activity, (ii) Defendants knew he engaged in protected activity, and (iii) Defendants discharged or otherwise discriminated against

[4] To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). The plausibility standard requires courts to accept the alleged facts as true and to make all reasonable inferences in favor of the plaintiff. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

him as a result of the protected activity. See United States ex rel. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439, 449 (6th Cir. 2008).

**a. The HMC Board and Gavulic**

Dr. Elian's FCA retaliation claim against the HMC Board and Gavulic falls short of alleging that he engaged in a protected activity. Protected activity must relate to "exposing fraud" or "involvement with a false claims disclosure." McKenzie v. BellSouth Telecommunications, Inc. (McKenzie II), 219 F.3d 508, 516 (6th Cir. 2000). Put differently, a plaintiff must have been retaliated against for attempting to stop or expose fraud on the government—not merely fraud on patients, or general regulatory noncompliance. Jones-McNamara v. Holzer Health Sys., 630 F. App'x 394, 399 (6th Cir. 2015); McKenzie II, 219 F.3d at 516-517 (protected activity does not include "merely urging compliance with regulations") (citing U.S. ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 744 (D.C. Cir. 1998)).

The core of Dr. Elian's alleged protected activity is his complaint that HMC should have implemented a cardiology-specific QA structure separate from its hospital-wide QA process. Dr. Elian contends the failure to implement a cardiology specific QA violated 42 C.F.R. § 482.21 and, therefore, jeopardized HMC's compliance with Medicare Conditions of Participation. His complaint, however, amounted to merely urging compliance with regulations, which courts have held is not conduct reasonably related to fraud against the federal government as a matter of law. Fakorede v. Mid-South Heart Ctr., P.C., 182 F. Supp. 3d 841, 849 (W.D. Tenn. 2016) (finding no protected activity where the plaintiff's complaints concerned internal expense allocations and reimbursement calculations rather than fraud against the federal government, and the complaint lacked factual allegations showing the plaintiff understood or intended to stop federal fraud); McKenzie II, 219 F.3d at 516-517. Here, Dr. Elian's effort in support of a different QA structure

has nothing to do with false certifications of compliance to Medicare. Because Dr. Elian's efforts had nothing to do with exposing fraud, his complaints cannot be protected activity under the FCA.

Additionally, Dr. Elian's allegations regarding HMC's transparency and management of the IGT funds are similarly deficient. The crux of Dr. Elian's complaints is that there is "lack of transparency" around the allocation of these funds and that his inquiries regarding distribution of these funds were "refused." Am. Compl. ¶ 39. As Defendants argue, Dr. Elian's only affirmative allegation about the IGT funds is that he knows nothing about how HMC uses them and that he believes they should be used to "meet bare minimum staffing and equipment requirements." Id. ¶ 38.

Under the FCA, Dr. Elian "need not establish that [HMC] actually violated the FCA," so long as he "show[s] that [his] allegations of fraud grew out of a reasonable belief in such fraud." Jones-McNamara, 630 F. App'x. at 400. An employee's activity is protected from retaliation only if: "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." Id. at 399-400 (punctuation modified).

Here, Dr. Elian's allegations regarding HMC's use of the IGT funds do not show that he held a reasonable belief that HMC engaged in fraud. Accepting his allegations as true, Dr. Elian is unaware of how the IGT funds are being allocated, and cannot specify any misuse or mismanagement, aside from his belief that the funds should be allocated to areas of need, which speaks more to regulatory compliance than fraud. At best his allegations reveal only a mere potential for impropriety on behalf of HMC and are not grounded in a good faith, reasonable belief in fraud.

Dr. Elian's other complaints—protesting the non-renewal of a cardiothoracic surgery group contract and the potential termination of his own agreement in 2020—are wholly unconnected to fraud on the government. The cardiothoracic surgery complaint involved cost considerations, not fraudulent billing. Unlike in United States ex rel. Crockett v. Complete Fitness Rehab, Inc., 721 F. App'x 451, 460-461 (6th Cir. 2018), where the plaintiff complained to her superiors about upcoding practices that caused Medicare to pay more than patients' circumstances warranted, Dr. Elian alleges only vague complaints about resource allocation and QA structure. He has not alleged that he reported specific false claims, improper billing practices, or certifications of compliance he knew to be false. As for the issue of the potential termination of his agreement, that is unrelated to fraud on the government.

Lastly, even if this Court assumed that Dr. Elian's complaints constituted protected activity, he has not adequately alleged that Defendants knew that he was contemplating or assisting in an FCA action, which is fatal to his claim. Employees must make clear their intentions of bringing or assisting in an FCA action. United States v. Wal-Mart Stores East, LP, 858 Fed. Appx. 876, 880 (6th Cir. 2021) ("[Plaintiff's] retaliation claim fails because he failed to plead that Walmart knew he was pursuing an FCA action."). Dr. Elian does not allege he ever informed Defendants that any of his complaints related to potential FCA liability or that he was considering filing a qui tam action. His complaints at the cardiology section meetings in 2020–2021 or at other times do not establish that Defendants were put on notice of FCA-related protected activity before they allegedly took any retaliatory action.

Therefore, the Court dismisses Count I against Defendants the HMC Board and Gavulic.

**b. Dr. Alkotob**

Dr. Alkotob argues that the retaliation claim against him must be dismissed because Dr. Elian has not alleged that the two shared an employer/employee relationship. Alkotob Mot. at PageID.219. The Court agrees.

Originally, employees could only bring actions against their actual employer under § 3730(h). Vander Boegh v. EnergySolutions, Inc., 772 F.3d 1056, 1062 (6th Cir. 2014). However, in 2009, Congress expanded the scope of § 3730(h) to cover "[a]ny employee, contractor, or agent." Id. (citing Fraud Enforcement and Recovery Act of 2009, Pub. L. 111–21, 123 Stat. 1617). As such, in addition to an employee's actual employer, "the current version of the statute also covers independent contractors and other employment-like relationships." Tibor v. Mich. Orthopaedic Inst., 72 F.Supp.3d 750, 759 (E.D. Mich. 2014).

Here, Dr. Elian has not established that he had an employment-like relationship with Dr. Alkotob. Both doctors are physicians in private practice who have been granted privileges at HMC. Nevertheless, Dr. Elian alleges that Dr. Alkotob exercised substantial influence over his ability to practice medicine, to teach residents, and to maintain relationships with patients, resulting in an adequate employer/employee relationship at the pleading stage. Am. Compl. ¶¶ 5, 63, 79.

These allegations, however, do not transform the relationship between two colleague physicians into an employment-like relationship for purposes of individual FCA liability. Dr. Alkotob's roles as chief of cardiology and director of the catheterization laboratory gave him influence over peer review and quality assurance processes, but it did not place him in an employment-like relationship with Dr. Elian. Both physicians held independent privileges at HMC. Dr. Elian's contracts were with HMC itself, not with Dr. Alkotob. One contract expired

by its terms, and HMC exercised its contractual right to terminate the other without cause. Dr. Alkotob was not a party to these contracts and did not have the authority to hire or fire Dr. Elian.

Dr. Elian fails to set forth any facts showing that Dr. Alkotob dominated and dictated the actions of HMC or its board. Courts addressing the de facto employer argument have required evidence that a defendant dominated and dictated the actions of the defendant corporations and their boards. El-khalil v. Tedeschi, No. 18-CV-12759, 2019 WL 2325610, at *3 (E.D. Mich. May 31, 2019). No such allegations exist here.

Because Dr. Elian has not pled a plausible retaliation claim, Count I is dismissed against Dr. Alkotob as well.

**2. Tortious Interference Claim**

In Count II, Dr. Elian asserts that Defendants tortiously interfered with his business relationships with HMC, patients, and prospective patients. See Am. Compl. ¶¶ 108—120. "To succeed on a claim of tortious interference with a business expectancy, a plaintiff must establish 'the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resulting damage to the plaintiff.' " Puetz v. Spectrum Health Hosps., 919 N.W.2d 439, 453 (Mich. Ct. App. 2018) (quoting Dalley v. Dykema Gossett, P.L.L.C., 788 N.W.2d 679 (Mich. Ct. App. 2010)). Further, to satisfy the third element, the plaintiff must establish that the defendant "acted both intentionally and either improperly or without justification." Id.

**a. The HMC Board and Gavulic**

Dr. Elian has not sufficiently pled a claim for tortious interference with a business relationship against these Defendants. Under Michigan law, a defendant acting pursuant to a

contract is liable in tort only if the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations. Nelson v. Nw. Sav. & Loan Asso., 381 N.W.2d 757, 758 (Mich. Ct. App. 1985). For a plaintiff to proceed in tort against a party in court, the facts must establish a breach of duty independent of contract; mere allegations of negligence based on contractual duties do not suffice. Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co., 559 N.W.2d 647, 657 (Mich. 1997).

Here, Dr. Elian has not pled the existence of a duty owed to him separate from Defendants' contractual obligations. Dr. Elian's alleged business expectancies—his teaching services and call coverage relationships with HMC and derivative patient relationships—are governed by the written agreements between HMC and Flint Cardiovascular Consultants, P.C.[5] See 2021 Agreement PageID.276-292 (Dkt. 20-2); 2024 Agreement at PageID.294-308 (Dkt. 20-3). The agreements expressly provided for non-renewal and termination without cause. Id. at PageID.280-281; PageID.298-299. The teaching services were not renewed when the 2021 Agreement expired on March 31, 2024. 2021 Agreement at PageID.280. HMC exercised its contractual right to terminate the 2024 Agreement without cause on 60 days' notice, effective October 5, 2024. Mot. at PageID.251. To maintain a tortious interference claim, the plaintiff must establish that the defendant was a third party to the contract or business relationship. Reed v. Mich. Metro Girl Scout Council, 506 N.W.2d 231, 233 (Mich. Ct. App. 1993). HMC was a party to both agreements and, therefore, cannot interfere with its own contracts as a matter of law.

[5] When analyzing a 12(b)(6) motion to dismiss, the Court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." Bassett v. Nat'l Collegiate Athletic Ass'n, 528 F.3d 426, 430 (6th Cir. 2008).

As to Gavulic, corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation. Id. Dr. Elian has not alleged facts showing Gavulic acted solely for her personal benefit. On the contrary, Dr. Elian emphasizes that Gavulic acted in her official capacity as CEO. Dr. Elian's allegations that Gavulic's actions were retaliatory do not transform her corporate decisions into actions based primarily on personal benefit.

In Reed, the Michigan Court of Appeals affirmed summary disposition where plaintiffs alleged the CEO personally disliked one plaintiff and was out to "punish" him, holding that these allegations did not demonstrate the CEO acted "strictly for her own personal benefit." Id. Similarly here, allegations that Gavulic sought to silence Dr. Elian's criticism of HMC's operations describe institutional retaliation, not conduct undertaken for Gavulic's personal gain divorced from HMC's interests.

Dr. Elian's reliance on cases permitting liability where an employee acts "primarily" for personal benefit is also misplaced. While Tash v. Houston, 254 N.W.2d 579, 582 (Mich. Ct. App. 1977), recognizes that corporate or organizational officials may be liable if they act for personal motives unrelated to the employer's interests, Dr. Elian has not alleged such facts here. Unlike Tash, where a union official terminated an employee for spurning sexual advances—a paradigmatic personal motive, 254 N.W. 2d at 580, Dr. Elian alleges Gavulic retaliated to suppress complaints about hospital operations, which still implicates HMC's interests even if the retaliation was unlawful. Therefore, the complaint is devoid of any allegations that Gavulic acted with her sole personal benefit untethered from that of the hospital.

For these reasons, Count II is dismissed as to both HMC and Gavulic.

**b. Dr. Alkotob**

Dr. Elian alleges that Dr. Alkotob knowingly and intentionally interfered with his business relationship at HMC by orchestrating a sham quality assurance and focused professional practice evaluation process; disseminating false allegations regarding Dr. Elian's competence; and positioning himself and his associates to replace Dr. Elian's practice. Am. Compl. ¶¶ 79-80, 82-86. Dr. Elian further alleges that Dr. Alkotob acted to eliminate a professional rival and consolidate his own practice, including by recruiting replacement physicians and steering quality assurance actions for personal gain. Id. ¶¶ 61-62.

To satisfy the improper interference element, Dr. Elian must plead that Dr. Alkotob "acted both intentionally and either improperly or without justification." Puetz, 919 N.W.2d at 453. The amended complaint plausibly alleges both. Dr. Elian alleges that Dr. Alkotob selectively initiated and escalated quality assurance proceedings, recruited replacement physicians, disseminated negative allegations regarding competence, and allowed reputational harm to continue after Dr. Elian's exoneration. The amended complaint alleges that Dr. Alkotob acted for personal benefit to eliminate a professional competitor and expand his own practice. These are affirmative acts that plausibly support an inference of an intentional, improper motive. Michigan courts recognize that an agent may be liable for tortious interference where he acts outside the scope of his authority or for his own personal benefit. Dalley, 788 N.W.2d at 692.

While Dr. Alkotob argues that his actions were motivated by legitimate quality assurance and patient safety concerns, the Court must accept Dr. Elian's allegations as true and draw all reasonable inferences in his favor on a motion to dismiss. Iqbal, 556 U.S. at 678. Therefore, whether Dr. Alkotob's conduct was justified or privileged is a fact-intensive inquiry inappropriate for resolution at this stage. Dr. Elian has alleged facts supporting an inference of improper motive,

and that is sufficient to survive dismissal. Dr. Elian also alleges damages including loss of income, loss of patient relationships, damage to professional reputation, and loss of teaching and leadership opportunities.

Accordingly, Count II against Dr. Alkotob will proceed.

**3. False Light Claim**

In Count III, Dr. Elian asserts a claim against Defendants for false light invasion of privacy based on allegedly false statements that he was being investigated due to anonymous complaints regarding care quality, and that he was placed on an FPPE during that investigation. Am. Compl. ¶¶ 122–123.

Under Michigan law, a false light invasion of privacy claim requires: "(1) the defendant broadcast to the public in general, or to a large number of people; (2) information that would be highly objectionable to a reasonable person; and (3) by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." Porter v. City of Royal Oak, 542 N.W.2d 905, 909 (Mich. Ct. App. 1995). This tort "is limited to situations where the plaintiff is given publicity." Derderian v. Genesys Health Care Sys., 689 N.W.2d 145, 159 (Mich. Ct. App. 2004) (punctuation modified).

Defendants argue that Dr. Elian's false light claims should be dismissed for a lack of publicity. Dr. Elian's only specific factual allegation is that Dr. Alkotob told Dr. Syed Ahmed that Dr. Elian was on FPPE. Am. Compl. ¶ 123. He vaguely alleges that certain false statements were "conveyed to others within HMC and to members of the broader medical community" but provides no factual detail supporting dissemination to a large number of people. Id.

In Derderian, the Michigan Court of Appeals rejected a physician's false light claim even though he identified approximately twenty-five nurses, physicians, and other medical personnel

who referred to him as "Dr. Death." 689 N.W.2d at 160. The court held this was insufficient to establish publication "to the public in general, or to a large number of people," particularly where the incidents occurred only in the presence of other employees. Id. Dr. Elian's allegations fall even shorter than the unsuccessful showing in Derderian.

While Dr. Elian argues dissemination within a professional community may suffice, he has not alleged facts showing broadcast to a sufficiently large group within that community. His speculation "on information and belief" that communications "extended to persons outside HMC in the broader medical community" is insufficient. Dr. Elian has not pled a plausible false light claim against any of the named Defendants.

Therefore, this claim is dismissed from the amended complaint.

**4. 42 U.S.C. § 1983 Claim**

In Count IV, Dr. Elian claims that Defendants retaliated against him for exercising his First Amendment right to free speech. Neither party contests that HMC is a public hospital owned by the City of Flint and that a Section 1983 claim is, therefore, appropriate.

There are three elements to a First Amendment retaliation claim: (i) the plaintiff engaged in protected speech; (ii) "an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct"; and (iii) the adverse action was motivated at least in part by the plaintiff's protected speech. Myers v. City of Centerville, 41 F.4th 746, 759 (6th Cir. 2022). Defendants contend that Dr. Elian has neither alleged facts showing that he engaged in constitutionally protected speech, nor shown that the alleged adverse action was motivated at least in part by the protected speech. Mot. at PageID.269-271.

Defendants first contend that Dr. Elian's speech was unprotected pursuant to his official duties because his complaints were made internally at cardiology section meetings and as a

member of HMC's medical staff. Id. at PageID.270. To determine whether the speech of a public employee is protected, the Court must engage in a three-step inquiry. Barrow v. City of Hillview, 775 F. App'x 801, 811 (6th Cir. 2019) (punctuation modified). The first step asks whether the speech addressed a "matter of public concern." Id. The second step asks whether the employee spoke as a private citizen or in furtherance of his official duties. Id. The third step requires the Court to balance "the interests of the parties and determine if the employee's speech interest outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. (punctuation modified). Defendants dispute only the second step of this analysis. Mot. at PageID.271.

The Court concludes that Dr. Elian has sufficiently alleged that he spoke out as a private citizen. While it is true that the law does not protect statements by employees "pursuant to their official duties," Garcetti v. Ceballos, 547 U.S. 410, 422 (2006), the amended complaint alleges that Dr. Elian raised concerns not only through "internal medical-staff channels but also, on information and belief, to public officials and/or outside entities responsible for oversight of HMC and public funds, including by seeking Board-level oversight and transparency regarding public funding and compliance." Am. Compl. ¶ 133. There is nothing in the amended complaint, or Defendants' briefing, that suggests raising concerns of patient safety and quality assurance to public officials and other entities responsible for oversight of HMC falls within the scope of Dr. Elian's official duties as a cardiologist. See Ashford v. Univ. of Michigan, 89 F.4th 960, 972 (6th Cir. 2024) ("Speech made outside an individual's chain of command is less likely to be within an employee's ordinary job responsibilities, as is speech that an employee's ordinary job responsibilities would not require them to make."). Therefore, Dr. Elian has plausibly alleged he engaged in protected speech.

Defendants next contend that "Dr. Elian has not pled facts that provide a plausible basis to claim that Defendants took actions against him motivated by his alleged protected speech." Mot. at PageID.271. However, Dr. Elian plausibly alleges that adverse action was taken not long after raising his concerns and that those actions were motivated at least in part by his protected speech. Am. Compl. ¶ 136. For instance, Dr. Elian claims he has been a cardiologist employed by HMC for over 20 years and that only after voicing his concerns, Defendants: (i) terminated his long-standing contract, (ii) manufactured and disseminated false complaints against him, (iii) threatened to refer him to Centers for Medicare & Medicaid Services, and (iv) subjected him to meritless Focused Professional Practice Evaluations and HIPAA investigations. Id. In the Sixth Circuit, non-renewal of a contract constitutes adverse employment action for purposes of a retaliation analysis. See Gaspers v. Ohio Dep't of Youth Servs., 648 F.3d 400, 414 (6th Cir. 2011). Further, actions that threaten the plaintiff's livelihood or economic interests may constitute adverse action. Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 728 (6th Cir. 2010). The Court finds the alleged conduct qualifies as adverse action under the First Amendment, and that Dr. Elian has sufficiently pleaded that Defendants' actions were motivated by his speech. The elements of First Amendment retaliation are satisfied.

Defendants also argue that the Board is immune from a § 1983 action as a municipality. "To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal violation occurred because of a municipal policy or custom." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005); Monell v. Dep't of Social Servs., 436 U.S. 658, 694 (1978). The plaintiff "must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [the] particular injury was incurred due to execution of that policy." Alkire v. Irving, 330 F.3d 802, 815 (6th Cir. 2003).

Here, all that Dr. Elian offers is the conclusory assertion that there was an "official policy, widespread custom, pattern or practice of silencing and retaliating against physicians who raise concerns about patient safety and misuse of public funds." Am. Compl. ¶ 131. Dr. Elian offers no other employees impacted by the policy or any other specific facts. This threadbare assertion is insufficient at the pleading stage. Iqbal, 556 U.S. at 680.

Defendants also contend that they are entitled to qualified immunity "because the facts alleged do not make out a violation of a constitutional right that was clearly established when the events occurred such that a reasonable official would have known that their conduct violated it." Mot. at PageID.272.

The Sixth Circuit employs a two-step inquiry to determine if a defendant is entitled to qualified immunity. Martin v. City of Broadview Heights, 712 F.3d 951, 957 (6th Cir. 2013). The "first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable [official] would have known that his conduct violated it." Id. These "two steps may be addressed in any order," but "both must be answered in the affirmative for a plaintiff's claim to proceed." Id.

The inquiry into whether a First Amendment right was "clearly established" is "particularly context-driven" and generally is not resolved at the pleading stage because it requires "further development of the record." MacIntosh v. Clous, 69 F.4th 309, 321 (6th Cir. 2023). For this reason, the Sixth Circuit has suggested that a qualified immunity defense is best resolved on summary judgment, at least with respect to the "clearly established" prong. Id. at 315. Here, Defendants have not explained why the First Amendment right was not clearly established, and Dr. Elian has plausibly pled that Defendants violated his First Amendment right for the reasons

discussed. The Court finds that the question of whether qualified immunity applies is premature and that the issue is more appropriate for summary judgment.

Accordingly, Dr. Elian's § 1983 claim cannot survive against the Board but survives against all other Defendants.

## III. CONCLUSION

The Court grants Dr. Alkotob's motion to dismiss (Dkt. 19) with respect to Counts I and III only. The motion is denied as to Counts II and IV. The Court grants the Board's motion to dismiss (Dkt. 20) with respect to Counts I, II, III. Count IV is dismissed with respect to the Board but will proceed against Gavulic and Dr. Alkotob. The earlier motions to dismiss (Dkts. 14 and 15), filed before the amended complaint are denied as moot.

**SO ORDERED.**

Dated: September 25, 2026
Detroit, Michigan

s/Mark A. Goldsmith
MARK A. GOLDSMITH
United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 25, 2026.

s/Joseph Heacox
JOSEPH HEACOX
Case Manager